FILED

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF VIRGINIA
### ALEXANDRIA DIVISION

2014 SEP - 4  P 4: 37

CLERK US DISTRICT COURT
ALEXANDRIA, VIRGINIA

|  |  |
|---|---|
| CHARITY CHIDINMA EMERONYE SWIFT, ) | |
| Plaintiff, ) | |
| v. ) | Case No: 1:14-cv-1139 (ZO/ƐDD) |
| FRONTIER AIRLINES, INC. (a Colorado corporation) ) | |
| and JANE DOE, ) | |
| Defendants. ) | |

## COMPLAINT

Charity Chindinma Emeronye Swift (hereinafter "Plaintiff"), by herself *pro se*, and on

her own behalf, herein alleges the following:

## NATURE OF THE CASE

1. Plaintiff, a United States citizen born in the Federal Republic of Nigeria, and a

resident of Alexandria, Fairfax County, in the state of Virginia, brings this action seeking

declaratory, injunctive, and monetary relief against Frontier Airlines, Inc., and Jane Doe,

(herein Defendants), for unlawful discrimination. As Described in this Complaint, agents

of defendant, unlawfully discriminated against her, by refusing to allow her, the only

African/African-American woman and black person on the flight, to board the plane

unless she paid $25.00, even though defendant's agents had issued her a boarding pass

1

like all others traveling on same flight, on the basis of her perceived race, color, ethnicity, alienage, ancestry, and/or national origin. Defendants' actions were willful, intentional, reckless, and in violation of 42 U.S.C. § 1981 as amended by the Civil Rights Act of 1991; Title VI of the Civil Rights Act of 1964, 42 U.S.C. §2000d; Infliction of Emotional Distress, and Defamation under the state of Virginia's Tort Laws. In addition to seeking compensatory and punitive damages, plaintiff seeks declaratory and injunctive relief requiring defendant to desist from and remedy such discriminatory action.

## JURISDICTION AND VENUE

2.  The court has jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. §§ 1331, 1343(a)(4) and 1367. Plaintiff's action for damages, punitive, declaratory, equitable and other monetary relief is authorized by 28 U.S.C. §§1343(a)(4), 2201, 2202 and 42 U.S.C. Section 1981a(b)(1). Venue is proper in the U.S. District Court in the state of Virginia under 28 U.S.C. § 1391 because the events giving rise to these claims arose from defendant doing business in Virginia (Reagan Washington National International Airport), and Plaintiff resides in Virginia.

## INTRODUCTION

3.  Plaintiff brings this civil rights lawsuit to ensure that the mandate that everyone in this country is treated equally, as embodied and guaranteed in federal and state anti-discrimination laws, does not become meaningless when the rights of persons perceived to be African, African-American, Black or non-Caucasian Americans are affected. The aftermath of the horrific events of September 11, 2001, has seen a rise in incidents of

discrimination by airlines against non-Caucasian citizens of the United States. The actors have invariably pretended and hidden behind security and safety arguments even in circumstances where their actions clearly have nothing to do with anything close to, or relating to the security or the safety of anyone. Some airlines and their agents have used the genuine fear and need for security and safety of travelers to foster and carry out their personal bigotry and racist intentions. They have done so, and continue to do so, despite President Bush's admonition during his address to Congress following the attacks that "no one should be singled out for unfair treatment or unkind words because of their background or religious faith." They have also ignored Attorney General Ashcroft's plea that "we must not descend to the level of those who perpetrated Tuesday's violence by targeting individuals based on their race, their religion, or their national origin."

4. Several federal laws expressly prohibit airlines from discriminating against an individual because of that person's race, color, national origin, religion, sex, or ancestry. Specifically, 49 U.S.C. § 40127(a) provides that an "air carrier or foreign air carrier may not subject a person in air transportation to discrimination on the basis of race, color, national origin, religion, sex, or ancestry," 49 U.S.C. § 41702 requires that U.S. carriers provide safe and adequate transportation, and 49 U.S.C. § 41310 prohibits air carriers and foreign air carriers from unreasonably discriminating against any person in foreign air transportation. Finally, 49 U.S.C. § 41712 prohibits unfair and deceptive practices by air carriers. As the Department of Transportation noted in its Consent Order against United Air Lines, Inc., Docket OST-2011-0003, November 1, 2011,"each of these provisions has been interpreted to prohibit air carriers from discriminating on the basis of

3

race, color, national origin, religion, sex, or ancestry. See American Airlines, Inc., OST-2003-15046-18 (August 21, 2003) and United Air Lines, Inc., Order 2003-11-13 (November 19, 2003). As exemplified by its numerous Consent Orders against several airlines, the Department of Transportation, pursuant to aforementioned federal laws have made clear to airlines that discrimination against persons solely on the basis of their race, color, national origin, religion, sex, or ancestry, is prohibited. Nevertheless, airlines like defendant, egregiously and recklessly continue to discriminate against persons on the basis of their race, color, national origin, religion, sex, or ancestry, in violation of federal and state civil rights, without regard to the individual's rights, as they did to Plaintiff.

5. This suit is brought in response to one such egregious and reckless incident. In an overt and blatant act of racial discrimination, Plaintiff Charity Chidinma Emeronye Swift, a woman, an American citizen of African descent, was denied her right to board the plane at the gate, after defendant's agents issued her and her Caucasian husband (both attorneys), their boarding pass and cleared them for boarding, until she paid twenty-five dollars ($25.000 for her carry-on luggage, even though no one else including her husband was asked to pay for their carry-ons and even though defendant had already measured Plaintiff's and her husband's carry-on luggage and approved it for boarding. Defendant Frontier Airline, Inc.'s agent at the gate (name unknown and designated "Jane Doe" in the caption of this case) threatened, degraded, intimidated and humiliated Plaintiff, telling her she was going to call the airport security office to arrest her and she in fact, did – she yelled out over the heads of everyone at the gate and surrounding gates, "can someone call the airport security police for me." Defendant Frontier Airlines' agent Jane Doe's

actions had no basis and were unwarranted, as the Frontier Airlines Customer Relations person Plaintiff complained to few days later, agreed with her. Plaintiff brings this suit to make sure no one in the future is subjected to same kind of unlawful, humiliating and degrading treatment by Frontier Airlines and/or its agents.

## PARTIES

### Plaintiff

6. Plaintiff Charity Chidinma Emeronye Swift, is a black woman, a citizen of the United States of America, and a citizen and resident of the Commonwealth of Virginia. She is a native of the Federal Republic of Nigeria in West Africa. Charity Chidinma Emeronye Swift has an L.L.B. from the University of London and a L.L.M. from DePaul University, and has been admitted to the bar in New York. She is an attorney and a member of the law firm, Swift & Swift, Attorneys at Law, P.L.L.C. where she works with her husband Stephen Christopher Swift (a Caucasian), also a member and attorney of the firm, who is expected to be called as a witness.

### Defendants

7. Defendant Frontier Airlines, Inc. ("Frontier Airlines") is an air carrier engaged in the business of transporting passengers. It is incorporated in Colorado. Its corporate headquarters is located at: 7001 Tower Road, Denver, Colorado 80249. Defendant Jane Doe is an employee of Frontier Airlines whose name is unknown.

8. In February 2003, Frontier Airlines, Inc. received about seventy million dollars ($70,000,000.00), in federal financial assistance from the U.S. Department of Transportation, pursuant to sections 101 and 103 of the Air Transportation Safety and System Stabilization Act, P.L. 107-42.

## FACTS GIVING RISE TO THIS ACTION

9. In August 2013, a father and son, both clients of Plaintiff's husband, invited Plaintiff and her husband to the wedding of the son/client. Plaintiff and her husband accepted the invitation. Despite their workload, Plaintiff and her husband managed to eke out the time and planned to use that opportunity to visit Yellow Stone National Park, which they had never seen before. On August 19, 2013, Plaintiff and her husband booked two-way return flights, through their travel agent, Air World Travel, from Ronald Reagan Washington National Airport, in Arlington, Virginia, ("Reagan Airport") to Bozeman Airport, in Bozeman, Montana (Bozeman), and back to Reagan Airport. **See attached Exhibit A.** The flight from Reagan Airport to Bozeman Airport was on United Airlines. The flight from Bozeman Airport to Reagan Airport, was on Frontier Airlines, Inc. There was a stopover at Denver Airport with both flights.

10. Plaintiff and her husband had a total of two pieces of luggage - one carry-on luggage each. They were told by our booking agents that carry-ons were free. This was confirmed when they arrived at the appointed date, at Reagan Airport and United Airlines did not charge them for their two carry-on pieces of luggage, and they had a no-hassle flight to

6

and safely arrived at Denver Airport. They departed Denver Airport, at 9:55 pm, and again, there was no charge for their two carry-on pieces of luggage, and they checked in with their carry-ons like the rest of the travelers on their flight. They had a no-hassle trip from Denver Airport to Bozeman on United Airlines.  They attended the wedding, which was beautiful and had a wonderful time. They also spent a couple of days sightseeing nature's wonders, including the Old Faithful Geyser, one of the most spectacular and glorious gifts nature has given America, that never failed to entertain by keeping exact time! Their trip was magnificent, and seeing Yellow Stone made it a once in a lifetime trip, and one that especially left Plaintiff in a glorious sense of awe, appreciation and unbridled joy, until Frontier Airlines' agent Jane Doe, at the Denver airport boarding gate, snuffed all that from Plaintiff, by her unlawful discriminatory treatment of her, and left her an emotional wreck.

11.  On September 4, 2013, Plaintiff and her husband, joyfully and gratefully bid farewell to their hosts, Yellow Stone National Park, and the state of Montana. Plaintiff and her husband arrived at Bozeman Airport and went to the Frontier Airlines counter to check in and obtain their boarding passes from Bozeman to Denver Airport. Defendant's ticketing agents at the Bozeman Airport checked them in, with their two pieces of carry-on luggage and handed them their boarding passes without more. They were not asked to pay anything for their carry-ons, and so they paid no charges, just like others, who were not asked to pay anything when they checked in as they did, with only carry-on luggage. At the boarding gate, Plaintiff and her husband presented their boarding passes as was required and as everyone did, and were allowed to board the plane, again, with their

carry-on which was stowed in the overhead cabin of their assigned seats. **See attached Exhibit B.**

12. Plaintiff and her husband's flight on Frontier Airlines, from Bozeman to Denver Airport, was a no-hassle flight. They arrived safely without any incident and again, they went to the Defendant's counter for their final check in for the trip to Reagan Airport.

13. When Plaintiff and her husband arrived at Frontier Airline's Denver counter to check in and get a boarding pass for the flight to Reagan Airport, the younger (Plaintiff presumes) of two of Frontier Airline's ticketing personnel, asked both Plaintiff and her husband whether they had any luggage to check in. Plaintiff and her husband answered, "No!" All they had was their carry-on luggage. The young lady then asked to see their carry-ons. Plaintiff and her husband showed the lady their two pieces of carry-on luggage. She asked Plaintiff and her husband to place, their luggage one at a time, into a metal measuring box to ensure that they had the right size of carry-on. Plaintiff and her husband complied, and each carry-on luggage was certified as within the carry-on luggage size for the purpose of fitting into the overhead cabin. After measuring each luggage, she gave them "thumbs up" and said, here you go, and handed them their boarding passes (without asking them to pay for their carry-ons because there was no reason to do so whatsoever, so they paid nothing, as they had done so far, to that point, on both their trip over to and back from Montana. The young lady further advised them on the appropriate gate to board their plane for Reagan Airport. They thanked her and proceeded to the gate for boarding.

8

14. Plaintiff and her husband arrived at the boarding gate and waited for a while before boarding began, and until their "zone" – zone 2 – was announced for boarding. The flight was a completely full flight and their boarding gate was A38. **See attached Exhibit C.** Gate A38 and the surrounding gates were full of travelers waiting in their respective boarding gates. When zone 2 was called for boarding, Plaintiff and her husband fell in line. There were fewer than four people in front of them. Plaintiff was in front of her husband in the line, and each was carrying their own carry-on. The two young women who checked them in and gave them their boarding passes earlier, were at the gate letting people on-board. However, as Plaintiff was next in line, and just as she stretched her hand to hand over her boarding pass to one of the two young women, another woman ("Jane Doe") who was definitely older than the two young ladies that dealt with Plaintiff and her husband earlier, appeared and said, "give it to me", i.e. Plaintiff's boarding pass. It happened so fast that she basically snatched Plaintiff's boarding pass out of her hand.

15. Instead of tearing and giving Plaintiff the assigned seat coupon part of it, as they were doing with other passengers, and let Plaintiff pass to board like others before her, the woman looked at Plaintiff and her carry-on and asked, "Is this your luggage?" Plaintiff answered "yes". Then Jane Doe said to her, "You have to pay twenty-five dollars before you can board." Plaintiff asked her why? Jane Doe loudly, rudely and dismissively replied, "I have just told you, you have to pay for your carry-on luggage before I will allow you to board." Thinking she thought her carry-on will not fit in the overhead cabin, and that was why Jane Doe was asking Plaintiff to pay for it, because

9

Jane Doe was going to tag it and check in so that Plaintiff would not have to take it in with her, Plaintiff explained to Jane Doe that it will fit because the young lady behind her had already measured it and found that it was the right size. Jane Doe then raised her voice in anger and said to her, "don't you understand English that I said you must pay for your luggage before I can let you board this plane, otherwise you are going nowhere." At this point, everyone's attention was alerted and they were all now looking at Plaintiff as Jane Doe was yelling at her and bullying her in front of her husband and all the other people there, as if she had done something wrong. As surprised, confused and furious as her husband was, he kept his self-control and said nothing as her ordeal continued. Even Plaintiff's husband's high exercise of control and decorum in the face of Jane Doe's horrible treatment of his wife, did not faze Frontier Airline's employee Jane Doe after she realized he was Plaintiff's husband.

16. Plaintiff then asked Jane Doe, if that was the case, that carry-ons must be paid for, why were she and her husband not asked to pay on the whole trip by both United Airlines and Frontier Airlines, until this last leg of their journey, and why were they not told or asked for payment by this young lady (Plaintiff pointed at her), who checked them in, gave them the thumbs up after measuring it, assigned them their seats and gave them their boarding passes and told them they should go board? Jane Doe angrily waived Plaintiff off with her left hand and said, "Take your luggage and get out of this line, move over that way" (pointing to her left). All this time, Plaintiff's husband was standing right behind her with his own carry-on luggage, quietly watching what was going on without

saying a word. Jane Doe, who was tormenting Plaintiff, said nothing to her husband, and did not ask to see his boarding pass, or ask him to pay for his carry-on luggage.

17. As Plaintiff and her husband moved aside, and off from their now boarding line, Plaintiff watched everyone else boarding without being asked to pay for their luggage before boarding. So, Plaintiff asked Jane Doe, why she was the only one with a boarding pass who is asked to pay $25 before boarding the plane? She turned at Plaintiff and angrily threatened, "do you want me to make you pay fifty dollars or do you want to pay twenty-five dollars?" Plaintiff explained to Jane Doe that she failed to understand why she was singling her out to pay for her carry-on when the rest of the passengers were allowed to board without her or anyone else asking them to pay before boarding. Plaintiff then asked her, "If I must pay, why are you not asking my husband to also pay because we both have carry-ons, booked same flight together, have exact same boarding passes? Jane Doe then became irate and yelled at Plaintiff and said, "Shut your mouth, I don't want you to talk to me again, I have already told you, if you don't pay, I will make sure you don't board this flight." Plaintiff further explained to her that the matter was not paying $25, but the fact that she was singling only Plaintiff out to pay, as a condition of her boarding a flight she had already fully paid for, and after she had already been issued a boarding pass (usually, a boarding pass will not be issued to anyone unless one is asked to pay, when appropriate, and after payment has been made) like the rest of the passengers, did not make sense to her, coupled with the fact, that all through the three flights that she and her husband had already made during the trip, two on United Airlines **see attached Exhibit D** and one on Frontier Airlines (from Bozeman to Denver) again,

see **Exhibit B**, they were not asked to pay, and suddenly she was singled out to pay for her carry-on – same carry-on she had on all the flights, as a condition for her boarding her prepaid flight.

18.  At this point, Jane Doe got very angry at Plaintiff, and was so irate that she, with the loudest voice that she could muster, turned to Plaintiff and shouted: "Can't you see that I don't care, and I don't want to hear you say anything more to me again, you pay or I will call the airport security police to come and arrest you." At this time, the anger, embarrassment and humiliation Plaintiff was feeling because of the way she was singled out and treated so unfairly, and without any justifiable reason, turned to fear. Plaintiff feared that Jane Doe, was so obviously full of hatred for her (even though she had never seen her before, and hardly knew her), could actually call the police to arrest her, even though she had not disturbed the peace, broken any law, and certainly was  not a security or safety risk to the airplane, anyone boarding it, or anyone around the gate or anywhere for that matter. Suddenly her heart started pounding and racing, and Plaintiff started shaking allover. Plaintiff tried to recover and get hold of herself. But before she could, as if Jane Doe, who was bullying and tormenting her sensed, that what she was doing to Plaintiff has affected her emotionally, and that she was hurting, yelled out on top of her voice, "Can someone call me an airport security police?" As Plaintiff looked at, and turned from her husband, her eyes caught the young lady who issued them their boarding passes. She was flushed and looked terrified herself. As their eyes met, as if she wanted to tell Plaintiff something, she invitingly and almost in a whisper asked Plaintiff: "do you want to pay now?" Plaintiff replied "yes". And gave her her credit card. As she took

payment she whispered her apologies to Plaintiff, telling her that she was a new employee and that she was sorry that she could not do anything.

19. All Jane Doe's actions towards Plaintiff happened in front of everyone in line at the gate, and the surrounding gates. She singled her out because she was a black African woman in a place she felt she had no business being - where everyone else was white. When Jane Doe realized that the white man behind Plaintiff was her husband, it infuriated her even more, as it was visibly apparent on her face and the way she looked down on both Plaintiff and her husband. She rudely and angrily bullied, intimidated, threatened and defamed Plaintiff by innuendo when she yelled out for someone to call the airport security police to arrest her, even though she knew Plaintiff had done nothing illegal and was not a flight risk by any imagination or standard. By calling for the police, Jane Doe insinuated that Plaintiff was a flight risk, have committed a crime, or was disturbing the peace; all things that were false and she knew it to be so. You do not call the police to come and arrest someone in front of the public if they have done nothing wrong. Jane Doe unlawfully and intentionally, with malice, set out to discriminate, humiliate and inflict emotional distress on Plaintiff, and in fact, did so, because she was a black woman and an African. She hated her because of who she was, her color, and national origin, and treated her unfairly with unprovoked hatred and malice. Jane Doe's treatment of her was so abhorrent to Plaintiff, that she felt threatened, intimidated, humiliated, degraded and vilified. Jane Doe unlawfully and intentionally discriminated against Plaintiff and this made her very sick in her stomach, because she could not understand why and where such hate came from this woman she had never met in her

13

life, because she did nothing to her or anyone to warrant her treating Plaintiff the way she did, except for her being a Black African woman.

20. After Plaintiff paid, she and her husband were allowed to board the plane after everyone else had. From the time her ordeal began, she watched while all other passengers, including her own husband, were allowed to board, without being asked to pay and did not pay for their carry-ons. She was the only one who was asked to pay. Jane Doe was incensed when Plaintiff told her that Stephen was her husband and questioned why he too was not asked to pay as a condition for boarding the plane. Not only was Plaintiff the only person who was asked to pay, she was the only Black, African and/or African American passenger on that flight and onboard that airplane. The rest of the occupants of that airplane were all white Caucasian men and women, including her husband.

21. By the time Plaintiff and her husband boarded the plane, she was very distraught and as she sat in her seat, she cried her heart out. She felt devastated by the thought that she could have been arrested, had someone called the police as Jane Doe requested, taken away in front of everybody at the gate, and adjoining gates, perhaps in handcuffs as a criminal, even though she did nothing wrong, but just because she was a black and an African woman. She thought of the detrimental effect such news of her being arrested and/or detained by police at the airport would have on her legal career, and how it would have caused her husband unnecessary and unwarranted anguish. These thoughts became

the beginning of a lingering nightmare and sleeplessness that she suffered for a long time after, as a result of the incident.

22. As Plaintiff walked through the isle to her assigned seat and just as she was about to sit down, a Frontier Airlines flight attendant in her uniform who was seated behind her seat, but was not part of the crew for the flight, who saw her crying, asked if she was O.K. She answered, "no!" She asked Plaintiff what the matter was, and Plaintiff explained her ordeal to her. The flight attendant told her that what Jane Doe did was awful and that she did not understand why she was asked to pay for her carry-on. She apologized to Plaintiff, but told her that she cannot do more for her because she was not on duty.

23. On returning home, the next day or so, Plaintiff called the Frontier Airlines Customer Complaint line and complained about her ordeal at the hand of one of their employees. The lady she spoke to, took her e-mail address and promised to report and/or investigate the matter and get back with her. She in fact, did write Plaintiff after a week or so, but all she did was apologize, and no explanation was given to her as to why their employee singled out a black woman and made her boarding a flight she fully prepaid for, conditional on her paying a $25 carry-on luggage fee, when no one else who was white Caucasian, including her own husband, was charged such fee as a condition for boarding.

24. By the time Plaintiff and her husband arrived home from their trip, her ordeal in the hands of Defendant's employee Jane Doe, cast a depressing cloud over Plaintiff's memorable happy experiences of the wedding they attended that took them to Montana in the first place, and the once in a lifetime experience she and her husband shared of the Yellow Stone National Park wonders, including watching Old Faithful deliver its magic at the appointed time.

25. Plaintiff spent the rest of the year having nightmares about what happened and what could have happened to her had the airport police arrested her. This recurring nightmare, coupled with sleepless nights as the whole episode kept playing in her head, and keeping her awake, not only made her feel humiliated and vilified, it also sapped her of energy that she needed to carry out her job as a lawyer.

26. Plaintiff and her husband have been badly affected by this incident. The experience left Plaintiff's husband with a deep sense of disgust, anger and frustration, as he watched helplessly because he did not want to escalate matters, while Defendant's employee Jane Doe discriminated against his wife because she was a black African woman, married to a white man. To wit, the thought of the whole ordeal that in 2013, in America, a person could harbor such intense hate in their minds against another, solely on the basis of their skin color, background and origin was shocking and terrifying.

## REQUISITES FOR RELIEF

27. By reason of Plaintiff's factual allegations as set forth above, there is actual controversy between Plaintiff and Defendants. A declaration from this court that Defendant Frontier Airlines, Inc., and its agent Jane Doe's actions, violated Plaintiff's rights is therefore necessary and appropriate.

28. Defendants' continued discriminatory conduct will result in irreparable harm to plaintiff, including but not limited to violations of her legal rights. Plaintiff has no adequate, or complete remedy at law to address the most invidious wrong described herein. Plaintiff therefore seeks injunctive relief restraining Defendants from engaging in the unlawful acts and practices described above.

## CLAIMS FOR RELIEF

## COUNT I: 42 U.S.C. § 1981
## DISCRIMINATION IN THE MAKING AND ENFORCEMENT OF CONTRACTS

29. Plaintiff re-alleges paragraphs 1 through 28 and incorporates them by reference as though fully stated herein as part of Count I of this Complaint.

30. Section 1977 of the Revised Statutes, 42 U.S.C. Section 1981 as amended guarantees all persons the same right to make and enforce contracts as non-African-Americans. The term "make and enforce" contracts includes the making, performance, modification, and

termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of contractual relationship.

31. The gate agents for Frontier Airlines Flight #720 on September 4, 2013, were at all relevant times, agents and/or employees of Defendant Frontier Airlines, Inc.

32. Defendant is liable for the unlawful acts of its agents and employees directly and/or under the doctrine of *respondeat superior*.

33. Defendants engaged in intentional discrimination based on Plaintiff's perceived race, color, ethnicity, and/or origin, in singling her out and making her paying for her carry-on a condition of her boarding the airplane even though others who were all white, were not asked to pay including Plaintiff's own husband, and even though Plaintiff had been issued a boarding pass and told she was OK for boarding just like the rest of the passengers on same flight #720 on September 4, 2013. In so doing, Defendants discriminated against Plaintiff in the making and enforcement of her contract with Frontier Airlines, her prepaid ticket to travel on Frontier Airline Flight #720 on September 4, 2013. Consequently, Defendants' unlawful actions have caused Plaintiff to suffer deprivation of her right to make and enforce contracts as enjoyed by white citizens under 42 U.S.C. § 1981.

34. Defendants' actions were intentional, malicious, willful, wanton, and showed a callous, reckless disregard for Plaintiff's civil rights, and have directly and proximately

caused Plaintiff financial injury and humiliation, degradation, mental anguish, pain, and suffering.

## COUNT II: TITLE VI OF THE CIVIL RIGHTS ACT OF 1964 (42 U.S.C. § 2000D)
## Discrimination by Recipient of Federal Financial Assistance/Funding

35. Plaintiff re-alleges paragraphs 1 through 34 and incorporates them by reference as though fully stated herein as part of Count II of this Complaint.

36. Defendant Frontier Airlines is a recipient of federal financial assistance, and so, is covered by Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000D). Title VI and its implementing regulations prohibit recipients of federal assistance and monies from discriminating on the basis of, among other things, race, color, or national origin. Plaintiff is a black African and Defendants discriminated against her because of her race, color and national origin. Defendants' actions in treating Plaintiff, who is black, so brazenly different from other passengers on flight #720, who were all white, including her own husband, on the basis of Plaintiff's perceived race, color, and/or national origin, constitute discrimination against Plaintiff in violation of Title VI and its implementing regulations.

37. Defendants' actions were intentional, malicious, willful, wanton, and showed a callous, reckless disregard for Plaintiff's civil rights, and have directly and proximately caused Plaintiff financial injury and humiliation, degradation, mental anguish, pain, and suffering.

## COUNT III: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
## (VIRGINIA TORT)

38. Plaintiff re-alleges paragraphs 1 through 37 and incorporates them by reference as though fully stated herein as part of Count III of this Complaint.

39. Defendants' extreme and outrageous conduct, as described herein above, was done with intent to cause, or with reckless disregard of the probability of causing Plaintiff to suffer severe emotional distress in the form of mental anguish and suffering, humiliation, shame, shock, degradation, nightmares and sleeplessness resulting in extreme fatigue which impacted on her ability to do her work, by diminishing the level of energy that she used to have prior to her ordeal with Defendant's employee, when she was able to sleep well without having nightmares about the incident. Defendants' conduct was made more extreme when Jane Doe called out for someone to call the airport security police to arrest Plaintiff in front of all the passengers at the gate and the adjoining gates. Also, even after Plaintiff tried to point out to her that her conduct was discriminatory against her because of her race, by asking why her husband who was white was not asked to pay, and why other passengers were not asked to pay, she paid no heed. She simply carried on tormenting Plaintiff, with impunity. Defendants' intentionally and and/or recklessly caused Plaintiff emotional distress.

40. As a proximate result of Defendant's extreme and outrageous conduct, Plaintiff suffered humiliation, mental anguish, emotional and physical distress, and has been injured in mind and body in degrees and amounts to be determined at trial. The conduct

of Defendant mentioned herein, were willful, reckless, malicious, oppressive, and done with a callous and reckless disregard for Plaintiff's rights and the consequences that were certain to occur, and thus, justify an award of exemplary and punitive damages against Defendants.

## COUNT IV:  DEFAMATION (VIRGINIA TORT)
### By Innuendo, Inference, Implication or Insinuation

41. Plaintiff re-alleges paragraphs 1 through 40 and incorporates them by reference as though fully stated herein as part of Count IV of this Complaint.

### The Defamatory Statements

42.  The two defamatory statements upon which this defamation claim is based are Defendant's employee's statements, made by yelling out on top of her voice and saying: **"… I will call the airport security police to come and arrest you"** and, **"can someone call me an airport security police?"** These statements were published to everyone present at Gate A38 and adjourning gates. The airport was teaming of passengers waiting to board their flights. By raising her voice unreasonably loud, Defendant's employee, intentionally wanted everyone to hear her and intentionally called the attention of everyone around to look at Plaintiff and know she was calling the police for Plaintiff. By this statement, Defendants disparaged Plaintiff by insinuating in that statement that Plaintiff has committed a crime, is disturbing the peace, or was a security threat to travelers, Frontier Airlines, Inc., its employees and crew, and the airport, even though Jane Doe knew all these to be utterly untrue and false.

21

## The Statements' Defamatory Meanings

43. The statements were reasonably susceptible to three levels of false and defamatory meanings, constituting "defamation per quod" or defamation by innuendo, insinuation, inference or by implication: (1) that Plaintiff had committed a crime; (2) that Plaintiff was disturbing public peace; and (3) that Plaintiff was a security risk.

44. Defendant Frontier Airlines' employee Jane Doe knew or should have known that calling the airport security police to arrest a passenger, in an American airport, in view of the horrific incidents of 9/11, will automatically stir a sense of fear into people and that the call for an Airport security police commonly will be interpreted by those who hear it to mean: a person must have committed a crime, is breaching the public peace, or is a security risk needing the security police to deal with the matter. To those who heard the statements and looked at Plaintiff and knowing that Plaintiff was the person for whom Jane Doe was calling the security police, would have interpreted it as disparaging and a negative aspersion on Plaintiff's character. Jane Doe's statements were made so loud that it was clear that she intended all passengers present and anyone close by to the gate and the adjourning gates to hear it.

## Falsity of the Statements

45. At the time the Defamatory Statements were made and published, Defendant Frontier Airlines' employee Jane Doe knew it was false, and that she had no basis for her statements. Jane Doe's defamatory statements, implied or insinuated that Charity Emeronye Swift had committed a crime, or was disturbing the peace, or that she was a

security risk, because these are the reasons that could require or justify the need to call on an airport security police. All Plaintiff did, was exercise her Constitutional right to free speech, by discussing and posing some reasonable and necessary questions necessitated by Jane Doe's conduct in the circumstances. Jane Doe knew or should have known that her statements and its meanings were utterly untrue and false, yet she recklessly and maliciously published it to the public, to intimidate and inflict shame and humiliation on Plaintiff, and in so doing, violated Plaintiff's rights and hurt her reputation, solely on the basis that she was a black woman of African ancestry and national origin, at a place she believed Plaintiff had no business being – a place where all other passengers were white, including Plaintiff's husband.

46. Defendant's employee's conduct in publishing her statements to everyone who is not deaf, in such a crowded public place, as described herein, was false and maliciously made with intent to injure Plaintiff. Therefore, Plaintiff is entitled to an award of punitive damages in the amount sufficient to punish Defendants for their malicious conduct and deter such misconduct in the future.

47. As a direct and proximate result of Defendants' conduct in publishing the above statement, Plaintiff suffered great emotional distress, mental anguish, humiliation, and physical distress. Plaintiff felt her character and reputation had been impugned, and she feels degraded and vilified by Defendants' conduct.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests that this Court:

(a) Declare that the actions of Defendant described above constituted discrimination on the basis of race, color, ethnicity, alienage, ancestry, and/or national origin in violation of 42 U.S.C. § 1981, 42 U.S.C. § 2000D;

(b) Hold that Virginia's Tort Laws of Intentional Infliction of Emotional Distress and Defamation by Slander have been violated against Plaintiff;

(c) Enter a permanent injunction directing Defendant and its management, officers, agents, and employees to take all affirmative steps necessary to remedy the effects of the illegal, discriminatory conduct described herein and to prevent similar occurrences in the future;

(d) Award Plaintiff compensatory damages in an amount to be determined at trial for Plaintiff's loss and injury including, but not limited to, economic loss, shock, humiliation, embarrassment, emotional distress, and a deprivation of Plaintiff's right to make and enforce contracts, to travel as a passenger in air transportation and enjoy such rights as white people regardless of her race, color, ethnicity, alienage, ancestry, or national origin;

(d) Award Plaintiff exemplary and punitive damages in an amount to be determined at trial that would punish Defendant for its willful, wanton, and reckless conduct and that would effectively deter Defendant from engaging in similar conduct in the future;

(e) Order Defendant to cease and desist from all future discrimination or retaliation against Plaintiff;

(f) Award Plaintiff prejudgment interest;

(g) Award reasonable costs incurred in this action; and

(h) Award such other relief as the Court deems appropriate and just.


## TRIAL BY JURY IS DEMANDED ON ALL ISSUES TRIABLE BY JURY

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury of all issues that can be tried by jury.


Respectfully submitted this 4th day of September, 2014.


*Charity C. Runye Swift*

Charity Charity Emeronye Swift
*Plaintiff Pro Se*
Swift & Swift, Attorneys at Law, P.L.L.C.
21 Eisenhower Avenue, Suite 200
Alexandria, Virginia 22314-4688
Telephone: (703) 717 – 0000
Facsimile:  (703) 535 – 8205
E-mail: charity@swift.law.pro