**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

_____

|  |  |
|---|---|
| **CHARITY CHIDINMA** ) | |
| **EMERONYE SWIFT,** ) | |
| ) | |
| **Plaintiff,** ) | **Civil Action No. 1:14-CV-1139** |
| ) | |
| **v.** ) | **Hon. Judge Liam O'Grady** |
| ) | **Hon. Magistrate Judge Ivan D. Davis** |
| **FRONTIER AIRLINES, INC.** ) | |
| **(a Colorado Corporation),** ) | |
| **and JANE DOE,** ) | |
| ) | |
| **Defendants** ) | |

_____)

**PLAINTIFF CHARITY EMERONYE SWIFT'S MEMORANDUM OF LAW IN**
**SUPPORT OF HER OPPOSITION TO DEFENDANT'S MOTION TO DISMISS HER**
**COMPLAINT PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6)**

Charity Emeronye Swift ("Mrs. Swift"), by and through her undersigned counsel, submits this

memorandum of law in support of her opposition to Defendant Frontier Airline Inc.'s

("Frontier") motion to dismiss her complaint pursuant to Federal Rule of Civil Procedure

12(b)(6).

**INTRODUCTION**

This case is about the violation of Mrs. Swift's civil rights and her rights under Virginia laws.

She is a United States citizen, born in the Federal Republic of Nigeria, and a resident of

Alexandria, Fairfax County, Virginia. As described in her Complaint, agents of defendant

unlawfully discriminated against her, by refusing to allow her, the only African/African-

American woman and black person on the flight, to board the plane unless she paid $25.00, and

1

in the process subjected Mrs. Swift to insult, ridicule, intimidation, threat of arrest, and in fact, a call to the airport security police for an arrest of Mrs. Swift, because of her national origin and accent that Defendant's agent did not like, and because of her race, even though defendant's agents had already issued her a boarding pass. As it turned out, Mrs. Swift was not obligated to pay for her carry-on luggage as Jane Doe demanded, as evidence Mrs. Swift later discovered after filing her complaint shows. Mrs. Swift claims that Defendants' actions were hostile, willful, intentional, reckless, and in violation of her civil rights pursuant to 2 U.S.C. § 1981 as amended by the Civil Rights Act of 1991; Title VI of the Civil Rights Act of 1964, 42 U.S.C. §2000d; Infliction of Emotional Distress, and Defamation under the Commonwealth of Virginia's Tort Laws.

Defendants Frontier Airlines Inc., ("Frontier")in its motion, to dismiss asks the court to dismiss Counts III and IV of Mrs. Swift's complaint pursuant to Rule 12(b)(6) because "the alleged emotional injuries and defamatory statements are insufficient to state a cause of action as a matter of law." Secondly, because "the purported statements by the gate agent telling Plaintiff that she would call airport security if she did not pay the $25.00 baggage are not defamatory as a matter of law." Finally, Frontier states, "when reviewed in the actual context (a debate) in which they were made, these statements cannot reasonably be understood to assert that Plaintiff had committed a crime involving moral turpitude, nor was there anything false about these statements, by innuendo or otherwise. Truth is an absolute defense." On page (1) of their memorandum in support of their motion, Defendants state, "her defamation claims are based upon the following alleged statements of the gate agent while they debated whether or not

Plaintiff would pay the fee: …" Defendants went on to provide on page 9 -10 what they termed "proper context."

Defendants' attempt to insinuate that there was any type of uncivil, uncalled-for behavior, or any kind of out-of-place behavior from Mrs. Swift, by invidiously using the word "debate." To attempt to insinuate that such was the case, and that there was any type of debate between Plaintiff and their ticket agent is totally false, offensive, and unfortunate. Further, for the sake of argument, even if there was such a debate between Mrs. Swift and Jane Doe, is it illegal or a crime, for citizens of the United States to express themselves albeit in the form of a debate? All Mrs. Swift did was reasonably and within her right, ask the agent questions regarding the fees the agent was demanding from her as a condition for her boarding the plane. Mrs. Swift did not know why she was, in effect, owing Frontier any fees, which payment of, became a condition for her boarding the plane and in the context that she had already made three (3) flights by the time of the incident, including one from Frontier Airlines, without any such fee demand, and the fact that earlier, when Jane Doe was not present, two (2) of Frontier Airlines' ticket agents had already measured Mrs. Swift's carry-on luggage, certified that it met Defendant's baggage requirements and issued her a boarding pass, had the opportunity and authority to ask for the fees, if it was required of Mrs. Swift, but they did not or failed to do so. The agent could have easily explained her reason for the fees to Mrs. Swift, because that was all she wanted to know from the agent, including any possible reason why her husband Stephen Swift, was not asked to pay such fees given that both of them were similarly situated in the circumstances, before she parts with her money. But the agent unreasonably and obdurately refused to give Mrs. Swift any reason whatsoever, other than tell her "I will ensure you don't board this plane unless you pay"

and her obvious dislike, hatred, spite for who Mrs. Swift - a black and African woman with an accent that visibly irritated her and which she could not stand, that made her react to Mrs. Swift's questions with such unwarranted and unbridled hostility towards Mrs. Swift. Instead, Jane Doe insulted, intimidated, ridiculed threatened Mrs. Swift in front of her husband, passengers that filled gate 38 and the surrounding gates which was full and teaming with vacationers trying to catch their flight, and in fact, called for the airport security police to come and arrest Mrs. Swift, because, as the facts about her overall actions show, Jane Doe, made it clear that she was very powerful, had authority from Frontier to deal with passengers as she liked, and that no one dare ask her questions about anything, even if she is commanding a passenger to part with that passenger's own property without more.

In the paragraphs Frontier quoted, as taken from Plaintiff's complaint paragraphs 14-18, the word "why" appeared at least six times, corroborating the fact that all Mrs. Swift did was ask questions with the hope that Jane Doe will give her answers regarding the reasons for the fees, that will help her to make sense of an incomprehensible horrible situation that the agent created without any justification whatsoever, which she found herself in, that almost culminated in her being arrested, handcuffed by airport security police and locked up, by asking reasonable questions in the circumstances. A situation that as it turns out, was totally unwarranted, because according to Defendant's own Contract of Carriage policies, as Mrs. Swift later discovered after her Complaint was filed, at the time she bought her ticket and at the time of her flight and incident with Jane Doe, Mrs. Swift, was not obligated to pay for her carry-on luggage on Defendant's flights, because Frontier Airlines, Inc., did not charge "economy" ticket holders for

their carry-on luggage when purchased through third parties until April 28, 2014, and Mrs.

Swift's ticket was "Economy" ticket.

Judging from Defendant's memorandum in support of its motion, and in support of its agent's

actions, they are in essence, justifying their agent's actions, by implying that the court should

find acceptable, the notion that in the United States of America, when a United States citizen like

Mrs. Swift, steps into the territory (boarding gate) of Frontier, they automatically lose their

constitutional and civil rights as citizens of this great country, to the extent that a ticket agent

could freely insult, intimidate, ridicule, threaten and in fact, carry out that threat, by calling the

airport security police to arrest such citizen/passenger, just because, for the purpose of argument,

and as Frontier claims, the citizen/passenger was having a "debate" (even though no such debate

took place), with an airline ticket agent who did not like it because she was so powerful,

accountable to no one, and can trample on anyone she wishes, if they do not do as she demands

and without any questions asked, or as Defendants put it in paragraph (1) of page (3) of their

memorandum, because "the agent allegedly became impatient and angry with Plaintiff …" for

asking legitimate questions.  Mrs. Swift strongly disagrees with Frontier's notion that that, is

how things are done in this country, or that such actions should be tolerated or encouraged, if the

court were to be persuaded by this notion, hence, this civil action. The United States of America

is a country with the rule of law. No one is above the law and everyone must be made to account

for their actions when they break the law. Frontier and its agent Jane Doe, violated Mrs. Swift's

federal civil rights, defamed her and intentionally caused her severe emotional distress under the

laws of the Commonwealth of Virginia.

Defendants' need to try and minimize their actions through their agent Jane Doe, and to

selectively choose what facts they feel serves their purpose and ignore those that are not helpful

to them, is understandable. However, that they choose to do so, does not necessary make their

arguments persuasive and for that and other reasons, Mrs. Swift asks this court not to be

persuaded by Defendants' selective facts, omitted facts, insinuations and arguments, and move

the court not to encourage the type of egregious actions of Frontier Airlines' agent, but to deny

their motion to dismiss as a deterrent to future such actions and behavior towards innocent

citizens of the United States of America who use the Services of Frontier Airlines Inc. in the

future, from the type of humiliation, ridicule, insult, intimidation, hostility Mrs. Swift suffered at

the hands of Frontier Airlines' Inc., agent Jane Doe.


## STATEMENT OF FACTS


In August 2013, a father and son, both clients of Plaintiff's husband, invited Plaintiff and her

husband to the wedding of the son/client. Plaintiff and her husband accepted the invitation.

Despite their workload, Plaintiff and her husband managed to eke out the time and planned to

use that opportunity to visit Yellow Stone National Park, which they had never seen before. On

August 19, 2013, Plaintiff and her husband booked two-way return flights, through their travel

agent, Air World Travel, from Ronald Reagan Washington National Airport, in Arlington,

Virginia, ("Reagan Airport") to Bozeman Airport, in Bozeman, Montana (Bozeman), and back to

Reagan Airport. The flight from Reagan Airport to Bozeman Airport was on United Airlines.

The flight from Bozeman Airport to Reagan Airport, was on Frontier Airlines, Inc. There was a

stopover at Denver Airport with both flights.

Plaintiff and her husband had a total of two pieces of luggage - one carry-on luggage each. They were told by their booking agent that carry-ons were free. This was confirmed when they arrived at the appointed date, at Reagan Airport and United Airlines did not charge them for their two carry-on pieces of luggage. They had a no-hassle flight to and safely arrived at Denver Airport. They departed Denver Airport, at 9:55 pm, and again, there was no charge for their two carry-on pieces of luggage, and they checked in with their carry-ons like the rest of the travelers on their flight. They had a no-hassle trip from Denver Airport to Bozeman on United Airlines.  They attended the wedding, which was beautiful and had a wonderful time. They also spent a couple of days sightseeing nature's wonders, including the Old Faithful Geyser, one of the most spectacular and glorious gifts nature has given America, that never failed to entertain by keeping exact time! Their trip was magnificent, and seeing Yellow Stone made it a once in a lifetime trip, and one that especially left Plaintiff with a glorious sense of awe, appreciation and unbridled joy, until Frontier Airlines' agent Jane Doe, at the Denver airport boarding gate, snuffed all that from Plaintiff, by her unlawful discriminatory treatment of her, and left her an emotional wreck.

On September 4, 2013, Plaintiff and her husband, joyfully and gratefully bid farewell to their hosts, Yellow Stone National Park, and the state of Montana. Plaintiff and her husband arrived at Bozeman Airport and went to the Frontier's counter to check in and obtain their boarding passes to Denver Airport. Defendant's ticketing agents at the Bozeman Airport checked them in, with their two pieces of carry-on luggage and handed them their boarding passes without more. They were not asked to pay anything for their carry-ons, and so they paid no charges, just like others, who were not asked to pay anything when they checked in as they did, with only carry-on

luggage. At the boarding gate, Plaintiff and her husband presented their boarding passes as was required and as everyone did, and were allowed to board the plane, again, with their carry-on which was stowed in the overhead cabin of their assigned seats.

Mrs. Swift and her husband's flight on Frontier Airlines, from Bozeman to Denver Airport, was a no-hassle flight. They arrived safely without any incident and again, they went to the Defendant's counter for their final check in for the trip to Reagan Airport.

When Mrs. Swift and her husband arrived at Frontier Airline's Denver counter to check in and get a boarding pass for the flight to Reagan Airport, the younger (Plaintiff presumes) of two of Frontier Airline's ticketing personnel, asked both Plaintiff and her husband whether they had any luggage to check in. Plaintiff and her husband answered, "No!" All they had was their carry-on luggage. The young lady then asked to see their carry-ons. Plaintiff and her husband showed the lady their two pieces of carry-on luggage. She asked Plaintiff and her husband to place, their luggage one at a time, into a metal measuring box to ensure that they had the right size of carry-on. Plaintiff and her husband complied, and each carry-on luggage was certified as within the carry-on luggage size for the purpose of fitting into the overhead cabin. After measuring each luggage, she gave Mrs. Swift and her husband "thumbs up" and said, here you go, and handed them their boarding passes (without asking them to pay for their carry-ons because there was no reason to do so whatsoever, so they paid nothing, as they had done so far, to that point, on both their trip over to and back from Montana. The young lady further advised them on the appropriate gate to board their plane for Reagan Airport. They thanked her and proceeded to the gate for boarding.

Mrs. Swift and her husband arrived at the boarding gate and waited for a while before boarding began, and until their "zone" – zone 2 – was announced for boarding. The flight was a completely full flight and their boarding gate was A38. Gate A38 and the surrounding gates were full of travelers waiting in their respective boarding gates. When zone 2 was called for boarding, Plaintiff and her husband fell in line. There were fewer than four people in front of them. Plaintiff was in front of her husband in the line, and each was carrying their own carry-on. The two young women who checked them in and gave them their boarding passes earlier, were at the gate letting people on-board. However, as Plaintiff was next in line, and just as she stretched her hand to hand over her boarding pass to one of the two young women, another woman ("Jane Doe") who was definitely older than the two young ladies that dealt with Plaintiff and her husband earlier, appeared and said, "give it to me", i.e. Plaintiff's boarding pass. It happened so fast that she basically snatched Plaintiff's boarding pass out of her hand.

Instead of tearing and giving Plaintiff the assigned seat coupon part of it, as they were doing with other passengers, and let Plaintiff pass to board like others before her, the woman looked at Plaintiff and her carry-on and asked, "Is this your luggage?" Plaintiff answered "yes". Then Jane Doe said to her, "You have to pay twenty-five dollars before you can board." Mrs. Swift asked her why? Jane Doe loudly, rudely and dismissively replied, "I have just told you, you have to pay for your carry-on luggage before I will allow you to board." Perplexed and thinking that Jane Does thought her carry-on will not fit into the overhead cabin, and that that, was the reason Jane Doe was asking Mrs. Swift to pay for it, because she was going to tag it and check it into the plane cargo hold, so that Plaintiff would not have to take it in with her, Mrs. Swift explained to

Jane Doe that it will fit into the cabin, because the young lady behind her had already measured it and found that it was the right size. Jane Doe then raised her voice in anger and said to Mrs. Swift, "don't you understand English and that I said you must pay for your luggage before I can let you board this plane otherwise you are going nowhere." At this point, everyone's attention was alerted and they were all now looking at Plaintiff as Jane Doe was yelling at her and bullying her in front of her husband and all the other passengers there, and around the adjoining gates, as if Mrs. Swift had done something wrong when in fact she did no such thing. As surprised, confused and furious as her husband was, he kept his self-control and said nothing as her ordeal continued. Even Plaintiff's husband's high exercise of control and decorum in the face of Jane Doe's horrible treatment of his wife, did not faze Frontier Airline's Jane Doe after she realized Stephen Swift, the man standing behind Mrs. Swift, was her husband.

Mrs. Swift then asked Jane Doe, if that was the case, that carry-ons must be paid for, why were she and her husband not asked to pay on the whole trip by both United Airlines and Frontier Airlines, until that last leg of their journey, and why were they not told or asked for payment by this young lady (Plaintiff pointed at her), who checked them in, gave them the thumbs up after measuring their carry-ons, gave them their boarding passes and told them they to go board? Jane Doe angrily waived Plaintiff off with her left hand and said, "Take your luggage and get out of this line, move over that way" (pointing to her left). All this time, Mrs. Swift's husband was standing right behind her with his own carry-on luggage, quietly watching what was going on without saying a word. Jane Doe, who continued tormenting Mrs. Swift, said nothing to her husband, and did not ask to see his boarding pass, or ask him to pay for his carry-on luggage.

As Mrs. Swift and her husband moved aside, and off from their now boarding line, Mrs. Swift watched everyone else boarding without being asked to pay for their luggage before boarding. So, she asked Jane Doe, why was she the only one with a boarding pass who is asked to pay $25 before boarding the plane? She turned at Mrs. Swift and angrily threatened, "do you want me to make you pay fifty dollars ($50) or do you want to pay twenty-five dollars ($25)?" Plaintiff explained to Jane Doe that she failed to understand why she was singling her out to pay for her carry-on when the rest of the passengers were allowed to board without her or anyone else asking them to pay before boarding. Mrs. Swift then asked Frontier's agent, "If I must pay, why are you not asking my husband also to pay because we both have carry-ons, booked same flight together, have exact same boarding passes? Jane Doe then became irate and yelled at Mrs. Swift and said, "Shut your mouth, I don't want you to talk to me again, I have already told you, if you don't pay, I will make sure you don't board this flight." Mrs. Swift further explained to her that the matter was not paying $25, but the fact that she was singling her out to pay, as a condition of her boarding a flight she had already fully paid for, and after she had already been issued a boarding pass (usually, a boarding pass will not be issued to any passenger if that passenger is required to pay for their carry-on or luggage, before boarding, until after payment has been made) like the rest of the passengers, did not make sense to her, coupled with the fact, that all through the three flights that she and her husband had already made during the trip, two on United Airlines and one on Frontier Airlines (from Bozeman to Denver) again, they were not asked to pay, and suddenly she was singled out to pay for her carry-on – same carry-on she had on all the flights, as a condition for her boarding her prepaid flight.

At this point, Jane Doe got terribly angry at Plaintiff, and was so irate that she, with the loudest

voice that she could muster, turned to Mrs. Swift and shouted: "Can't you see that I don't care,

and I don't want to hear you say anything more to me again, you pay or I will call the airport

security police to come and arrest you." At this time, the anger, embarrassment and humiliation

Mrs. Swift was feeling because of the way she was singled out and treated so unfairly, and

without any justifiable reason, turned to fear. Plaintiff feared that Jane Doe, was so obviously full

of hatred for her (even though she had never seen her before, and hardly knew her), could

actually call the police to arrest her, even though she had not disturbed the peace, broken any

law, and certainly was not a security or safety risk to the airplane, anyone boarding it, or anyone

around the gate or anywhere for that matter. Suddenly Mrs. Swift's heart started pounding and

racing, and she started shaking allover. Mrs. Swift tried to recover and get hold of herself. But

before she could, as if Jane Doe, who was bullying and tormenting her sensed that what she was

doing to Plaintiff has affected her emotionally, and that she was hurting, yelled out on top of her

voice, "Can someone call me an airport security police?" As Plaintiff looked at, and turned from

her husband, her eyes caught the young lady who issued them their boarding passes. She was

flushed and looked terrified herself. As their eyes met, as if she wanted to tell Plaintiff

something, she invitingly and almost in a whisper, asked Plaintiff: "do you want to pay now?"

Mrs. Swift replied "yes". And gave the young lady her credit card. As she took payment she

whispered her apologies to Plaintiff, telling her that she was a new employee and that she was

sorry that she could not do anything.

All Jane Doe's actions towards Plaintiff happened in front of everyone in line at the gate, and the

surrounding gates. She singled her out because she was a black woman with a different national

origin, in a place she felt she had no business being - where everyone else was white and ridiculed her because she had an accent she did not like. When Jane Doe realized that the white man behind Mrs. Swift was her husband, it infuriated her even more, as it was visibly apparent on her face and the way she looked down on both Mrs. Swift and her husband. She rudely and angrily bullied, intimidated, threatened and defamed Mrs. Swift by innuendo when she yelled out for someone to call the airport security police to arrest her, even though she knew Plaintiff had done nothing illegal and was not a flight risk by any imagination or standard and that Mrs. Swift had not behaved in anyway unlawful, she did not behave in anyway disorderly, or disturbed the public peace warranting her arrest by the airport police. By calling for the police, Jane Doe insinuated that Mrs. Swift was a flight risk, have committed a crime, or was disturbing the peace or has behaved in an orderly manner warranting police presence and action. Frontier's agent knew her insinuations were false yet she recklessly made the statement without regard to Mrs. Swift's rights and the effect it will have on her. You do not call the police to come and arrest someone in front of the public if they have done nothing wrong. Jane Doe was hostile to Mrs. Swift. She unlawfully and intentionally, with malice, set out to discriminate, intimidate, humiliate, ridicule, and inflict emotional distress on Plaintiff, and in fact, did so, because she was a black woman and an African and of a different national origin as the rest of the passengers, including her own husband who is a Caucasian. Jane Doe hated Mrs. Swift because of who she was, her color, and her national origin, and treated her unfairly with unprovoked hatred and malice. Jane Doe's treatment of her was so abhorrent to Mrs. Swift, that she felt threatened, intimidated, humiliated, degraded and vilified. Jane Doe unlawfully and intentionally discriminated against Plaintiff and this made her very sick in her stomach, because she could not understand why and where such hate came from this woman she had never met in her life,

because she did nothing to her or anyone to warrant such treatment, except for her being a Black

African woman and of a different national origin from her and the rest of the people on that

flight, including her own husband, and that she could not stand Mrs. Swift's perceived accent.

After Plaintiff paid, she and her husband were allowed to board the plane after everyone else

had. From the time her ordeal began, she watched while all other passengers, including her own

husband, were allowed to board, without being asked to pay and did not pay for their carry-ons.

She was the only one who was asked to pay.  Jane Doe was incensed when Plaintiff told her that

Stephen was her husband and questioned why he too was not asked to pay as a condition for

boarding the plane. Not only was Mrs. Swift the only person who was asked to pay while she

was standing there and watching, she was the only Black, African and/or African American

passenger onboard that airplane. The rest of the passengers on that airplane were all white

Caucasian men and women, including her husband.

By the time Plaintiff and her husband boarded the plane, she was very distraught and as she sat

in her seat, she cried her heart out. She felt devastated by the thought that she could have been

arrested, had someone called the police as Jane Doe requested, taken away in front of everybody

at the gate, and adjoining gates, perhaps in handcuffs as a criminal, even though she did nothing

wrong, but just because she was a black and an African woman. She thought of the detrimental

effect such news of her being arrested and/or detained by police at the airport would have on her

legal career, and how it would have caused her husband unnecessary and unwarranted anguish.

These thoughts became the beginning of a lingering nightmare and sleeplessness that she

suffered for a long time after, as a result of the incident.

As Plaintiff walked through the isle to her assigned seat and just as she was about to sit down, a Frontier Airlines flight attendant in her uniform who was seated behind her seat, but was not part of the crew for the flight, who saw her crying, asked if she was O.K. She answered, "no!" She asked Plaintiff what the matter was, and Plaintiff explained her ordeal to her. The flight attendant told her that what Jane Doe did was awful and that she did not understand why she was asked to pay for her carry-on. She apologized to Plaintiff, but told her that she cannot do more for her because she was not on duty.

On returning home, the next day or so, Plaintiff called the Frontier Airlines Customer Complaint line and complained about her ordeal at the hand of one of their employees. The lady she spoke to, took her e-mail address and promised to report and/or investigate the matter and get back with her. She in fact, did write Plaintiff after a week or so, but all she did was apologize, and no explanation was given to her as to why their employee singled out a black woman and made her boarding a flight she fully prepaid for, conditional on her paying a $25 carry-on luggage fee, when no one else who was white Caucasian, including her own husband, was charged such fee as a condition for boarding.

By the time Plaintiff and her husband arrived home from their trip, her ordeal in the hands of Defendant's employee Jane Doe, cast a depressing cloud over Plaintiff's memorable happy experiences of the wedding they attended that took them to Montana in the first place, and the once in a lifetime experience she and her husband shared of the Yellow Stone National Park wonders, including watching Old Faithful deliver its magic at the appointed time.

Plaintiff spent the rest of the year having nightmares about what happened and what could have happened to her had the airport police arrested her. This recurring nightmare, coupled with sleepless nights as the whole episode kept playing repeatedly in her head, and keeping her awake, not only made her feel humiliated and vilified, it also sapped her of energy that she needed to carry out her job as a lawyer.

Plaintiff and her husband have been badly affected by this incident. The experience left Plaintiff's husband with a deep sense of disgust, anger and frustration, as he watched helplessly because he did not want to escalate matters, while Defendant's employee Jane Doe discriminated against his wife because she was a black African woman, married to a white man, and of a different national origin. To wit, the thought of the whole ordeal that in 2013, in America, a person could harbor such intense hate in their minds against another, solely on the basis of their skin color, background and national origin was shocking and terrifying to her.

## LEGAL STANDARD

**Motion to Dismiss**

A Rule 12(b)(6) motion to dismiss tests the sufficiency of a complaint; "it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Melanie J. Sepmoree v. Bio-Medical Applications of Virginia, Inc.*, No. 2:14cv141, citing *Republican Party of North Carolina v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992). To survive a motion to dismiss, a

complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that

is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp.,*

*v. Twombly*, 550 U.S.544, 570 (2007)).


In deciding the motion, a court may consider the facts alleged on the face of the complaint, as

well as "matters of public record, orders, items appearing in the record of the case, and exhibits

attached to the Complaint." *Moore v. Flagstar Bank*, 6 F. Supp. 2d 496, 500 (E.D. Va. 1997)

(quoting *5A Charles A. Wright & Arthur Miller, Federal Practice & Procedure* § 137 (1990)).

The court may look to documents attached to the Complaint and those incorporated by reference

without converting a Rule 12(b)(6) motion into a Rule 56 motion for summary judgment. See

*Pueschel v. United States*, 369 F.3d 345, 35 n.3 (4th Cir. 2004) (citations omitted).


## ARGUMENT


## COUNT III:  INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS


Virginia law does recognize the tort of intentional infliction of emotional distress. The Virginia

Supreme Court recognized this intentional tort as a cause of action in *Womack v. Eldridge*, 215

Va. 338, 210 S.E.2d 145 (1974). There, the court held that the tort has four elements that must be

proved: (1) the wrongdoer's conduct was intentional or reckless; (2) the conduct was outrageous

and intolerable; (3) there was a causal connection between the wrongdoer's conduct and the

resulting emotional distress; and (4) the resulting emotional distress was severe. Id. At 342, 210

S.E.d at 148; accord, *Harris*, 271 Va. At 203, 624 S.E.2d at 33; Delk, 259 Va. At 136, 523

S.E.2d at 833; *Jordan v. Shands*, 255 Va. 492,498-99,500 S.E.2d 215,218- 19 (1998). *Almy v. Grisham*, 273 Va. 68, 80 (Va 2007).

Defendants' extreme and outrageous conduct, as described herein, was done with intent to cause, or with reckless disregard of the probability of causing Plaintiff to suffer severe emotional distress because, there was no justifiable reason whatsoever, for her treatment of Mrs. Swift and especially for calling the airport security police for her arrest.

Mrs. Swift claims that as a result of Jane Doe's treatment of her at the airport on September 4, 2013, she suffered severe mental anguish and suffering, humiliation, shame, shock, degradation, nightmares and sleeplessness resulting in extreme fatigue which impacted on her ability to do her work, by diminishing the level of energy that she used to have prior to her ordeal with Defendant's employee, when she was able to sleep well without having nightmares about the incident.

Defendants' conduct was so extreme when Jane Doe called out for someone to call the airport security police to arrest Plaintiff in front of all the passengers at the gate and the adjoining gates for no apparent reason. As a proximate result of Defendant's extreme and outrageous conduct, Plaintiff suffered humiliation, mental anguish, emotional and physical distress, and has been injured in mind and body in degrees and amounts to be determined at trial. The conduct of Defendant mentioned herein, were willful, reckless, malicious, oppressive, and done with a callous and reckless disregard for Mrs. Swift's rights and the consequences that were certain to occur as a result, and thus, justify an award of exemplary and punitive damages against Frontier.

Defendants claim that Mrs. Swift's claim of severe emotional distress is conclusory. This is ridiculous and irrelevant, because Mrs. Swift is the only one in the best position to express her pains, the way she feels or felt after such unwarranted assault on her reputation, her self-worth and her right not to be so humiliated, ridiculed insulted and vilified without any reason whatsoever. If one who has a headache can't explain how he or she feels, who can?

Mrs. Swift believes she has sufficiently made a claim of Intentional Infliction of Emotional distress.

## COUNT IV:  DEFAMATION AND DEFAMATION BY INNUENDO, INFERENCE, IMPLICATION OR INSINUATIOND

Virginia courts have historically viewed defamation lawsuits as a means to protect the basic rights of individual security and the uninterrupted entitlement to the enjoyment of one's reputation. *The Gazette, Inc. v. Harris*, 229 C. 325 S.E.2d 713 (1985).

Numerous court cases have discussed the basic elements that constitute a compensable defamation claim. In Virginia, there are three basic elements of defamation which include: (1) publication or the dissemination of information, (2) an actionable statement, and (3) intent. *M. Rosenbery & Sons v. Craft*, 183 Va. 512 (1944). Mrs. Swift believes her claim meets these elements.

In their memorandum, Frontier seem to confuse the relevant statement attributed to their agent by Mrs. Swift in her defamation claim. The relevant statement is not "can't you see that I don't

care, and I don't want to hear you say anything more to me again, you pay or I will call the airport security police to come and arrest you.'; and "can someone call me an airport security police?" As the Defendants state on page 1 of their memorandum. Rather, the relevant statement is the innuendo, inference, implication and or insinuation of meaning in those statements - the threat to call the police to arrest Mrs. Swift and the actual calling of the police for Mrs. Swift's arrest.

The police keep public order and unless such public order is disrupted or a crime is committed or is afoot, no one has any business calling the police to arrest anyone. Thus, when Jane Doe yelled out on the top of her voice calling for the police to arrest Mrs. Swift, she published a statement to all passengers at the boarding gate, and adjoining gates whose attention and focus turned to Mrs. Swift as a result of Jane Doe made her statements, which the public's natural understanding for such call is that a person must have committed a crime, disturbed the public peace or order, or is a security risk or threat to other passengers, given that it was at the airport, and concerned whether or not a passenger should be allowed to board the flight. Furthermore, in light of the level of heightened security in US airports, and legitimately so, Defendant's agent's statement is defamatory because it is innuendo, insinuates, infers and implicitly meant that a police was needed to keep order because Mrs. Swift has or was disrupting public order (even though she knew it was not true). Yet she intentionally did call for the police to arrest Mrs. Swift and in the process, impugned on Mrs. Swift's reputation without any justification or excuse.

In *Cashion v. Smith* 86 Va. 327, 749 S.E.2d 526 (Va.2013), the court noted, "however, statements may be actionable if they have a "'provably false factual connotation'" and thus "are capable of being proven true or false." *Fulste v. Riverside Healthcare Ass'n* 265 Va. 127, 575 S.E.2d 858, 861-62 (2003 (quoting *WJLA-TV v. Levin*, 264 Va. 140, 156, 564 S.E.2d 383, 392 (2002)). Defendant's agent's statement which implies that Mrs. Swift has done something unlawful, warranting her arrest by the airport security police, is a statement having provable false factual connotation and thus, capable of being proven true or false. It was in fact, false, and the Defendant's agent knew it was false. Otherwise, if in fact, Mrs. Swift had done something warranting her arrest by the police, she should not have been allowed to board the plane until the police had arrived and taken charge of the situation.

In a letter to attorneys in the case of *Alan W. Rogers v. County of Luisa, et al Luisa County Circuit Court Case CL 10-385 (2012)*, Circuit Court Judge Timothy K. Sanner, wrote: "It is a general rule that allegedly defamatory words are to be taken in their plain and natural meaning and to be understood by courts and juries as other people would understand them, and according to the sense in which they appear to have been used. In order to render words defamatory and actionable it is not necessary that the defamatory charge be in direct terms but it may be made indirectly, and it matters not how artful or disguised the modes in which the meaning is concealed if it is in fact defamatory. Accordingly, a defamatory charge may be made by inference, implication or insinuation." *Carwile v. Richmond Newspapers, Inc.*, 196 Va. 1 (1954) citing *James v. Powell*, 154 Va. 96 (1930 and *Moss v. Harwood*, 102 Va. 386 (1904). See also *Schnupp v. Smith*, 249 Va. 353 (1995). Consequently, while the words do not directly defame the plaintiff, the Court finds that they may be found to do so by inference, implication or

insinuation…" Mrs. Swift believes Judge Sanner's rulings applies to her case and pray the court to apply it to her case.

At this stage of the case, Mrs. Swift believes that all she is required to do for purposes of Rule 12(b)(6), is for her to meet the plausibility test of *Twombly* and *Iqbal*, and she believes her complaint has met that test.

For the foregoing reasons, Mrs. Swift respectfully asks this court to deny Defendant's motions to dismiss her Complaint.

Dated December 5, 2014.                              Respectfully submitted,


                                        */s/ Stephen Christopher Swift*
                                        Stephen Christopher Swift
                                        (Virginia State Bar ID No. 38419)
                                        Swift & Swift Attorneys, at Law, P.L.L.C.
                                        2121 Eisenhower Avenue, Suite 200
                                        Alexandria, Virginia  22314-4688
                                        Telephone: (703) 418-0000
                                        Facsimile:  (703) 535-8205
                                        Email: steve@swift.law.pro

                                        *Attorney for Plaintiff*
                                        *Charity Chidinma Emeronye Swift*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing document was electronically filed on December 5, 2014 using the Court's CM/ECF system with the Clerk of the Court, who will then send an electronic notice of filing to all counsel of record, including the following:

       Sarah E. Moffett (VA Bar No 72208)
       LeClairRyan, A Professional Corp.
       2318 Mill Road, Suite 1100
       Alexandria, Virginia 22314
       Telephone: (703) 647-5930
       Facsimile: (703) 647-5980
       Email: sarah.moffett@leclairryan.com

       and

       Paula L. Wegman (pro hac vice)
       Steven L. Boldt (pro hac vice)
       Adler Murphy & McQuillen LLP
       20 South Clark Street, Suite 2500
       Chicago, Illinois 60603
       Telephone: (312) 345-0700
       Facsimile: (312) 345-9860
       Email: pwegman@amm-law.com
       Email: sboldt@amm-law.com

                     */s/ Stephen Christopher Swift*
                     Stephen Christopher Swift