UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

|  |  |
|---|---|
| CHARITY CHIDINMA EMERONYE SWIFT,<br><br>Plaintiff,<br><br>v.<br><br>FRONTIER AIRLINES, INC. (a Colorado Corporation), and JANE DOE<br><br>Defendants. | Civil Action No. 1:14-cv-1139<br>Hon. Judge Anthony J. Trenga<br>Hon. Magistrate Judge Ivan D. Davis |

## AFFIDAVIT OF CHARITY C. EMERONYE SWIFT

COMES NOW, Charity Chidinma Emeronye Swift, and states, under oath, as follows:

1. I am over the age of eighteen, competent to testify, and under no legal disability and, if called and sworn as a witness, would testify to the following facts, which are based upon my own personal knowledge, and which I believe to be true and accurate.

2. I am a lawyer, admitted to practice law in the state of New York, since June 21, 2011.

3. I am the Plaintiff in the above captioned case, and my husband, Stephen Christopher Swift, is presently my attorney.

4. Sarah Moffett did not take part in any settlement discussion on January 9, 2015.

5. At all times during the discussions, my husband and my attorney, Stephen Swift, did not take part in any settlement discussions, even though he was present, as he had no authority from me, to do so for me, or on my behalf.

6. On January 9, 2015, both parties, appeared before Magistrate Judge Ivan D. Davis for hearing on Plaintiff's Motion for Leave to amend her Complaint – a motion Defendant opposed. After the hearing, and the Judge's decision partly in favor of Plaintiff, allowing her breach of contract count, I informed Paula Wegman ("Ms. Wegman"), counsel for the Defendant that my husband and I were leaving unless she still wants to talk to me as she previously indicated to me, during our telephone conversation about a week before the hearing (during that telephone conversation, she had asked me whether I would "like to talk" then on the phone, or after the hearing, and I told her that I would talk to her when I see her after the hearing), she said yes, that she still wants to talk to me. I asked if we could sit somewhere in the courthouse but she suggested that we go sit down and talk at the offices of the local counsel for Defendant, LeClair Ryan. So, the four of us, Ms. Wegman, Sarah Moffett, my husband Stephen Swift and I, went to the law offices of LeClair Ryan, which is about a three-to-five-minute walk from the court house.

7. At LeClair Ryan's office, the four of us sat in a conference room. Sarah offered us water and coffee, and for the best of about fifteen minutes, had some discussions, that did not relate to or refer to the case. Sara Moffett asked about the areas of law that I and my husband practiced and the state we were licensed to practice. I told her I was licensed to practice in the state of New

York. That I worked for a contractor at the Department of Justice for three years on the Savings and Loans cases, and that I did Antitrust Law for almost six years as a Legal Consultant, but that at present do Employment Law, and General Practice, while my husband told her he is a Patent attorney. Sarah then suggested that I should waive into the D.C. Bar or other states to which I informed her that it was not that easy for me to do, because I am classified as "foreign educated" attorney because I obtained my law degree from the United Kingdom. I explained to her that because I did not obtain my law degree from an "ABA approved law school" I cannot waive in because the rules are different. After these general discussions over coffee and water, Sarah excused herself and left the conference room, leaving the three of us, Ms. Wegman, my husband Stephen Swift and me.

8. After Sarah's exit from the conference room, the three of us remained there for about another hour, making the total time we were there to about one hour and fifteen minutes.

9. After filing my initial complaint, I received telephone calls and e-mail from Ms. Wegman asking if I could call her to discuss my case. When I called her, the first thing she said to me, after introducing herself as the attorney for the Defendant, was that when she got my case, she immediately thought it was one of those cases that should be settled, and that what was done to me was horrible! It was very comforting for me to hear her say those words, I thanked her and told her she was a nice person, as I believed she genuinely meant what she said. We even talked on a personal level that I told her my sister and her family live in Chicago, that I attended DePaul University and that whenever next I visited Chicago, I will contact her and she said sure, that will be nice. Because I have been so emotionally impacted by what happened to me on

September 4, 2013, in retrospect, I was naively but honestly drawn into taking Ms. Wegman and dealing with her as a friend, instead of as an adversary - the attorney for the Defendant, who was doing everything and anything possible, to defeat my case all along, albeit in a deceptively seemingly friendly way, until it suddenly dawned on me, that she actually was not my friend, at the end of our discussion and immediately after I informed her, as part of the discussion, that I would also like a written apology from an official from Frontier, to which Ms. Wegman furiously shot back at me, in a heightened and remarkably unpleasant and different tone from the seemingly friendly tone that she had used throughout the discussion, and told me that no such apology was going to be made unless she, herself, apologized to me on behalf of Frontier. I was stunned! And I said nothing further.

10.  During the January 9, 2015 discussion, Ms. Wegman spoke for most of the time. She began by saying that she wanted to discuss possible settlement and went on to explain to me, where she sees Defendant's position in the case. She also talked about the weakness of my case and cons for me, should I decide to take the case to trial.

11.  I explained to Ms. Wegman that I have been emotionally drained by the incident that precipitated my action against Frontier, and would like the whole matter to go away if I could, because each time I discussed it, as I was doing then, I become so emotional that I wanted to cry. I also told her, that I also did not like dragging my husband into the whole matter, and Ms. Wegman encouragingly enthused: "think also that you will have to go to Denver, for deposition of Defendant's witnesses and this will cost you time, and money and a lot of hassle."

12. I also explained to Ms. Wegman, during the discussion that the reason I engaged attorney Doug Coleman earlier, was to see if he can settle the case as when I attempted to do so and could not, when Ms. Wegman called me for the first time and I attempted to do so in an emotional state, and that attempt failed. Unfortunately, Mr. Coleman would also fail in his attempt to settle the case partly because Frontier believed they had a very strong case to go to trial with, and at every opportunity she had, Ms. Wegman continued to tell me how strong Defendant's case against me was.

13. Ms. Wegman was well aware of the emotional effect the unwarranted treatment from Frontier's agent on September, 4, 2013, had on me, and specifically during the discussions when I started reliving the whole episode in my mind, as I tried to retell my story to Ms. Wegman. She knew I was not in the required emotional state of mind, to legally effectuate a binding agreement, but she pushed forward, for it in a way and in circumstances I believe is indicative of bad faith.

14. During an attempted telephone settlement discussion, initiated by and with Ms. Wegman, immediately after I filed my action and prior to Defendant's filing their motion to dismiss my initial complaint, I had told Ms. Wegman that I would not accept a certain amount, which is twice greater than the amount of my counter offer on January 9, 2015, during the discussion and part of what Ms. Wegman calls a "valid settlement agreement" between the parties. Also, the settlement discussions my former attorney had with Ms. Wegman, I believe during a period close to three weeks if not more, failed also, partly because I refused to accept anything less than a certain amount (which is also several times more than my counter offer during the discussion and part of what Ms. Wegman calls a "valid settlement agreement" between the parties).

5

15. In my emotional state (which I expressed to Ms. Wegman at least three times during the discussion including telling her that I was feeling like I would cry, and then apologized for), I was so blindsided by emotion, and had no reasonable time or opportunity after Judge Davis' decision to reflect on the ramifications of his decision, and weigh it to see how it relates to the strength or weakness of my case, as was necessary before entering into any reasonable settlement discussions, that in the circumstances, I made a counter offer that was so unfair and unreasonably and in no way reflects the reality of the state of the case, and which did not make sense not only to me, but also to Ms. Wegman, I believe, who knew, or had reason to know in the circumstances, that I would never had made, or agreed to, given my past stand on the settlement issue, had I not been so emotionally overwhelmed as I was mentally reliving the experience as I retold my story to Ms. Wegman during the discussion, and such that would make it unconscionable for any reasonable person in good faith and in the circumstances, to hold such decision to be in part or whole, a "valid settlement agreement" between the parties.

16. I started my part of the discussion, by telling Ms. Wegman that the whole thing is very emotional for me. Surely, as I started retelling her what happened to me on the day of the incident (as in my complaint), I became emotional and at some point, told her that I am almost about to cry, but will try not to, but it was very difficult for me. During the whole discussion, I mentioned the fact that I was emotional several times as I truly was. Ms. Wegman knew that I was emotional. Several times, I paused to gather myself before continuing, and during those times, Ms. Wegman just looked at me and said nothing.

17. Throughout the discussion, including when I made a counter offer, I never once thought about the Judge's decision that morning or how it strengthened or weakened my case, because as I narrated what happened to me on the day of the incident, to Ms. Wegman my thoughts became crowded with overwhelming emotions that prevented me to fully grasp what was going on until the angry voice of Ms. Wegman, telling me that no apologies was going to be made by Frontier, as I requested as part of the discussions, stunned me, and I quietly and sheepishly said good-bye to Ms. Wegman and left with my husband.

18. During the discussion, Ms. Wegman said that Frontier would not settle for more than a certain amount and that the way they see it was to calculate how much it will cost for them to make a motion and if it was going to cost them less, they won't settle for an amount more than that, and that litigation is what she does, that she was ready to go to trial if I did not settle.

19. Ms. Wegman informed me that she had no authority to offer anything up to certain amount and did not see how Frontier would go beyond a certain amount. So she offered me an amount to which I made a counter offer. The result, I believe, in retrospect, as it seemed to me, was that in effect, Ms. Wegman, taking advantage of my emotional state of mind, set for me the perimeter of the amount I must ask for, and in my emotional state, and without time to think properly, I made a counter offer, that only someone in an emotional funk could have made in the circumstances, without any thought or consideration of the strength of my case, whatsoever, in light of the Judge's decision that morning, because I was so emotional at the time of the discussion, and taking advantage of that fact, Ms. Wegman immediately and swiftly accepted it, because it fell

into the perimeter, it seems to me, Ms. Wegman had predesigned for me as she was clearly discussing with me on a very different wavelength as I was with her, in my emotional stupor.

20. At some point during the discussion, Ms. Wegman asked me how many carry-on's I and my husband had at the time of our flight, i.e. whether we had anything in addition to our carry-ons. I told her that I had a small tote bag where I put the newspapers that I was reading and that my husband held my cultural head-tie that was in a Macy's plastic bag that I used for the wedding that took us to Montana and our flight on Frontier Airlines. I explained to her that we were carrying those items back on the flight the same way we brought them on our flights to Bozeman, Montana. To this, Ms. Wegman responded, that the small tote bag I had and my head-tie that my husband was carrying, was the reason I was charged for my carry-on. I responded and said, that still does not explain why my husband was not charged, and she said nothing further.

21. On no occasion whatsoever, during all the discussion, was anything said or mentioned by anyone including Ms. Wegman, about informing the court that the parties have entered into a settlement agreement or have settled the case, or anything whatsoever, about informing the court that the case has been settled, and thus, should dismiss the case. No discussion ever was made or suggested that the parties was going to do so at any time. I would not have agreed to such, until after there has been an executed and legally binding settlement agreement, because during all the discussions, and at all times, I intended and believed that both parties had the right to change their minds at any time until they executed the written release. Under no circumstances would I have accepted to be bound by any agreement that I did not have a reasonable time to think over and freely execute, and in the present situation, it was never my belief or intention to be bound

by the discussions, until I had reasonable time to think it over, and freely execute Defendant's release agreement sent to me.

22. After leaving my husband and I very briefly, about two to three minutes, apparently to call someone with authority to accept my counter offer, Miss Wegman returned almost immediately back to the conference room, stretched her hand out first to shake with my husband, who took no part whatsoever, during the whole discussion, as he had no authority to do so, and then next to me. My husband and I politely shook her hand.

23. Immediately after the handshakes, Miss Wegman asked, if there was any other thing I wanted? I said yes, that I would also like to have an official written apology from an officer from Frontier, but Ms. Wegman emphatically said No! That there will be no such apology, unless it was an apology from her, on behalf of Frontier. She then added, I will be sending you the release agreement, to which I responded, "we'll see."

24. As I left LeClair Ryan's office and Ms. Wegman, it became clear to me that my emotional state of mind during the discussion, overwhelmed and clouded my judgment, and prevented me from making a rational, reasonable decision during that period, which caused me to be angry and embarrassed, but relieved, because I knew and believed that the parties were free to change their minds at any time prior to signing of any release document. I was so embarrassed that I did not share my thoughts or feelings with my husband until later. I pleaded with my husband not to discuss anything about the case unless I raised the issue, and he sympathetically agreed.

25.  During the discussion, references were made only to my case against Frontier. At no time whatsoever, did anyone including Ms. Wegman, expressly mention, imply or allude to: REPUBLIC AIRWAYS HOLDINGS, INC., INDIGO PARTNERS LLC, FALCON ACQUISITION GROUP, INC., FRONTIER AIRLINES HOLDINGS, INC, AIR WORLD TRAVEL & TRAINING CORP., WORLDWIDE FLIGHT SERVICES, INC., ALLIANZ GLOBAL CORPORATE AND SPECIALTY, ALLIANZ GLOBAL RISKS US INSURANCE COMPANY,  AND ALLIANZ AVIATION MANAGERS, LLC, as part of the discussion, or are they in anyway part of the suit I filed, which is pending in the District Court.

26.  I have no suit pending against any of the above listed institutions, although I may have independent legal causes of action against, and the right to sue, some of them, should I decide to do so, and reserve the right to do so. I have not heard the names of most of them, nor did I know of their existence, until I surprisingly saw their names in Defendant's attached document titled "Confidential Full Release and Settlement Agreement." I certainly did not discuss nor have them in contemplation during my discussion with Ms. Wegman, as it was humanly impossible for me to discuss release of institutions I did not sue or know existed prior to, or during, an apparent settlement discussion, or after, until I began reading the Release.

27.  My husband did not read the Release document e-mailed to him by Ms. Wegman at the time he sent her the e-mail that requested added signature page for Defendant's signature. In fact, he read the document after I read it and refused to sign it. He printed it out, flipped through it and saw there was only a signature place for me, the Plaintiff, and none for the Defendant to sign,

10

and thinking it was a mistake (which we later realized was deliberate), without thinking much of it, sent Ms. Wegman an email to add Defendant's signature line.

28. My husband Stephen Swift, sent the email requesting the added signature line, without telling me, and without me seeing the document itself. After he sent the email, he later gave me the printed document to read. I did not read it then, and nothing further was said or discussed until Wednesday, when I finally read it. It was after reading it, that I explained to my husband how I felt about the whole matter since we left LeClair Ryan's office on January 9, and that I had already made up my mind not to sign the Release under any circumstances. It was then he told me about the email he sent Ms. Wegman regarding their signature line. I immediately asked him to inform Ms. Wegman that I was not going to sign her Release document, and after reading the release himself, he then agreed with my decision and advised me that he too, after careful review did not think it was in my best interest to sign the Release, and he immediately informed Ms. Wegman accordingly, via email.

29. That Friday, two days later, Ms. Wegman sent another copy of same release document she had sent earlier, with her signature.

30. My suit, which is pending in the District Court, is against Frontier Airlines, Inc., and not their attorney, Ms. Wegman.

I declare under oath and penalty of perjury, that to the best of my recollection, the foregoing is true and accurate.

Dated: February, 9, 2015

_____
Charity C. Emeronye Swift

SUBSCRIBED AND SWORN to before me

This  9th  day of  February , 2015

_____
NOTARY PUBLIC

Stephen Christopher Swift
NOTARY PUBLIC
Commonwealth of Virginia
Reg. # 253103
My Commission Expires 1/31/2017

12